IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>v.<br><br>JOSHUA CALVIN HUGHES,<br>JEROD WADE HUGHES,<br><br>              Defendants. | Cause No. 21-CR-00106-TJK<br><br>**JOSHUA HUGHES'**<br>**MOTION TO AMEND ORDER**<br>**OF DETENTION AND FOR**<br>**PRETRIAL RELEASE** |

Pursuant to 18 U.S.C. § 3145(b) the Defendant JOSHUA CALVIN HUGHES, hereby moves the Court to amend the Magistrate Judge's order of detention, and to amend it with an order allowing his conditional pretrial release.[1]  This motion is made for the reason that he is not a flight risk nor a danger to any person or to the community.

## THE FACTS

Joshua and Jerod Hughes were charged by complaint filed on January 28, 2021, with the following offenses:

---

[1]  The Undersigned is a Montana attorney whose application for admission to the District Court for the District of Columbia is pending with the Clerk of Court.  The Undersigned has been appointed to represent Defendant Joshua Hughes pursuant to the Criminal Justice Act.

- 18 U.S.C. § 1512(c)(2) - Obstruction of an Official Proceeding;

- 18 U.S.C. § 231(a)(3) - Obstruct/Impede/Interfere with Law Enforcement during a Civil Disorder;

- 18 U.S.C. § 1752(a)(1) - Knowingly Enter or Remain in Restricted Building Without Authorization;

- 18 U.S.C. § 1752(a)(2) - Knowingly Disrupt Government Business or Official Function;

- 40 U.S.C. § 5104(e)(2)(A) - Enter or Remain in Capitol Building Without Authorization;

- 40 U.S.C. § 5104(e)(2)(C) - Enter Capitol Building with the Intent to Disrupt Official Business;

- 40 U.S.C. § 5104(e)(2)(G) - Parade, Demonstrate, or Picket in a Capitol Building;

- 40 U.S.C. § 5104(e)(2)(C) - Enter Capitol Building with the Intent to Disrupt Official Business;

- 40 U.S.C. § 5104(e)(2)(G) - Parade, Demonstrate, or Picket in a Capitol Building;

- 18 U.S.C. § 1361 - Destruction of Property; and

- 18 U.S.C. § 2 - Aiding and Abetting.

See, Doc. 1.

2

On February 1, 2021, a transfer and detention hearing was held before United States Magistrate Judge John Johnston in the District of Montana in which the following evidence was presented:[2]

## Background

Joshua Hughes is 37 years old.  His brother and co-defendant, Jerod Hughes, is 36.  The two live in East Helena, Montana, and have a great relationship with each other.  They have lived in Helena, Montana, more than 30 years.  Josh suffers from necrosis of the scaphoid bone in his wrist.  Jerod suffers from irritable bowel syndrome which causes stomach pain.  All of their immediate family, which is very tight-knit, lives in the Helena, Montana, area, including their parents, three brothers and a sister, and Jerod's wife and children.  Jerod's wife, Catherine, suffers from debilitating interstitial cystitis.  She is disabled and Jerod is her sole caregiver.  Jerod is employed full-time by Valley Metal Building as a steel worker erecting metal buildings. He supports and provides for his family, takes care of Catherine at home, and does all of the shopping.  *Trans.*, 12;13 to 16:11.

Josh is self-employed and provides residential and commercial cleaning services for different businesses like real estate and construction companies. He also helps with his brother's store, Devout Nutrition, and is a personal

---

[2]  See Attachment A.

trainer.  *Id*., 16:14-22.

Both Jerod and Josh have the financial resources to make it to Washington, D.C. for any court appearances.  If released pending trial, Josh would buy plane tickets whenever he needed to and show up wherever he needed to.  *Id.*, 16:23 to 17:5.

In terms of criminal history, Josh has a misdemeanor theft conviction that occurred about nineteen years ago when he was around 18 or 19 years old.  Neither Josh nor Jerod were under a probationary sentence or on parole on January 6, 2021, when the events charged in the Indictment occurred.  *Id.*, 17:11-24.

Josh does not have any drug or alcohol issues.  He has had a medical marijuana card for years to deal with pain from the necrotic scaphoid bone in his wrist.  On some days the pain is so bad that he can't use his wrist.  His doctors recommended the medical marijuana card to treat his wrist pain.  If he were released, Josh would turn in his medical marijuana card and not use marijuana during the pendency of this case.  *Id.*, 17:25 to 20:1.

### Self-Surrender

The events charged in the Indictment occurred on January 6, 2021.  On Monday, January 11, 2021, Josh and Jerod found out by watching the news on television that they were persons of interest.  They wanted to clear that

up, identify themselves to law enforcement, and be up-front and forthcoming because it was the right thing to do. They have family members who were in law enforcement and they weren't trying to hide from anybody. They therefore called the FBI hotline and waited on hold for 15 minutes. When nobody answered, they went to the jail in Helena, Montana, and tried to self-surrender. They were told that there was a new building for the Sheriff's Office and the Helena Police Department, so they walked downtown to that building and identified themselves to a local detective. They then called the FBI to confirm their identities and to confirm that they had self-surrendered. They were met by an agent with the Federal Bureau of Investigation, Mark Seyler, who confirmed their identities. Between January 11 and February 1, 2021, they worked and waited to hear back from authorities. *Id.*, 20:12 to 23:3.

## January 6, 2021

Neither Josh nor Jerod have had any kind of association with political groups of any kind. They are not politically active and had never gone to a Trump rally, although they have gone to freedom of speech rallies. They did support President Trump, however, and when the President called "all patriots" to Washington, D.C. in his last week of public tweets, they decided to go to attend President Trump's rally and then go sightseeing and visit the

Lincoln Memorial.  Neither one of them had ever been to Washington, D.C. or

the Capitol.  They left Helena the night of January 3, 2021, at about 9:00 p.m.

and drove through the following day, January 4, 2021, to Tomah, Wisconsin,

where they spent the night.  On January 5, 2021, they got up and drove to

Gaithersburg, Maryland, and spent the night there.  On the morning of the

6th they drove to Washington, D.C. to attend the President's rally.  They

arrived about 11:30 a.m., parked, and found out where the rally was being

held.  President Trump started his speech sometime between 12:00 and 1:00

o'clock, and it lasted about 30 to 40 minutes.  Josh's impression was that

President Trump had invited them to go to the Capitol for another rally, and

Trump said he was going to walk with them down Pennsylvania Avenue.

When Josh and Jerod saw that he wasn't actually going to walk down

Pennsylvania Avenue, they stopped for lunch at a taco eatery.  They sat

down, warmed up, ate some food, used the restroom, and then walked down to

the Capitol.  *Id*., 23:4 to 26:25.

Upon arrival at the Capitol they saw that the police had opened up

barricades to allow people up onto the Capitol lawn and steps.  There were

tens of thousands of people.  Tear gas was in the air and people were getting

sprayed with OC spray.  Josh and Jerod worked their way up to the front of

the line to see what was going on.  They stayed off to the side, not engaging

with any officers or anybody else.  They did not intend to engage in any illegal behavior and just came to see what was happening.  *Id.*, 27:1-22.

They arrived at the back of the Capitol.  They walked through the crowd of people and joined the front line of people off to the side.  Then they walked up to the top of the steps area where the police had receded away from the barricades.  Some people off to the side started bashing in a window with a riot shield and a two-by-four.  They did not know who the people bashing in the window were, had never seen them before, and did not talk to them.  Josh was very surprised and didn't know what they were doing or why, and just stood back and watched.  The photographs that are in the Government's Statement of Facts (Doc. 1-1, p. 2) show Josh just standing there watching the other people breaking the window.  Josh did not provide any assistance to the two individuals that were engaged in this behavior, nor did he encourage them to do so.  He was very surprised by what they were doing.  *Id.*, 27:23 to 29:6.

Josh entered the Capitol building after he watched people go into the building.  Josh saw Jerod go in and so Josh followed him, not wanting to be separated.  Doc. 1-1, pp. 2 and 3.  Once inside he saw people moving towards the police officers down the hall, and saw his brother kick open a door, looking for Josh.  So Josh went over and tapped him on the shoulder and

showed him that he was right there.  Josh told Jerod that he was there and to

not do anything and to be peaceful.  *Id.*, 29:7-20; see also, Doc. 1-1, pp. 3 and

4.

They then followed the mob.  Josh walked around with his hands up the

whole time.  If he encountered an officer, he just stood still with his  hands

up.  He never threatened any officer, although he knew that he wasn't

supposed be there.  The only reason he crawled through the window and

followed the mob in the first place was to keep an eye on his brother and

witness what was going on.  He had heard people talking about wanting to do

like a sit-in and occupy the building, but he didn't imagine they meant going

in the building.  Josh thought they were going to be out on the steps.  So

when he saw people breaking in the windows and then flowing into the

building, he followed them in.  *Trans.*, 29:22 to 30:24.

Josh had no idea where he was or where he was going.  He just followed

people that were walking around.  He had not made a prior plan to engage in

any of the behavior that other people were doing while he was inside the

Capitol building.  He was following a group of people walking around the

building, and they encountered an officer, Eugene Goodman,[3] and he and

---

[3] Josh was able to identify Officer Eugene Goodman from the accounts
of the incident that he saw on television.

Jerod stayed back because he was armed and had his gun out.  He and Jerod weren't trying to engage with anybody.  The group of people around them followed the officer up the stairs.  One man chased the officer, and they followed behind, walking up the steps.  Josh didn't know who the man was and had never seen him before.  Josh did not assist him in chasing Officer Goodman.  He just walked up the steps behind him.  By the time he made it up to the upper landing, Josh looked down the hallway, and could see them turning a corner.  *Id.*, 30:15 to 31:23; see also, Doc. 1-1, pp. 5 and 6.

Josh and Jerod entered the Senate chamber as they were walking out of the building.  Somebody had kicked a door open off to his left, and they walked through the doors not knowing or having any idea where they were going.  But once we walked in, Josh recognized the Senate floor.  They were in there only a few minutes.  Doc. 1-1, pp. 7 and 8.  They walked around and looked at the building.  One man jumped into a chair, and Jerod and Josh and another gentleman told him to get out of the chair and to show some respect.  They told people not to mess with things.  Once they saw people rifling through stuff and desks and taking pictures and stuff, Josh told Jerod it was time to go.  They didn't want to be associated with that, and so they walked out of the building and left the Capitol grounds.  They heard the police calling out a 6:00 o'clock curfew, walked across town, and eventually found their car.

9

Josh was in such a state of shock at the time that he could barely use his phone or orientate directions. *Trans*., 31:24 to 32:21.

They were actually in the Capitol building a total of 10 or 15 minutes. During that entire period of time, Josh just walked around with his hands up the whole time. He did not take photographs and he never pulled out or used his cell phone. Josh touched his glasses in one picture (Doc. 1-1, p. 4) because they fogged up from the change of cold to hot in the building. The only reason he was at the Capitol was because the President told them to go march to the Capitol. The only reason he entered into the building was because he was just following the group, and he thought they were going to be doing a peaceful protest of just occupying and doing a sit-in. He was very surprised at the events that occurred. He is not a member of any kind of subversive group like the Oath Keepers or the Proud Boys. His position now is that they were wrong for being there. He feels misled by the President and he deeply regrets his actions there. *Trans.*, 32:22 to 34:3.

On January 6, 2021, Josh Hughes did not know that he had committed a crime or what crime he might have committed, if any at all, other than, maybe trespass. The only reason he followed the mob or the people into the Capitol building was because he thought there was going to be a sit-in protest. *Id.*, 49:23 to 50:7.

10

Magistrate Judge Johnston found that the Government had met its burden of proving dangerousness by clear and convincing evidence. Josh Hughes has been detained in a variety of facilities since February 1, 2021, while being transported from the District of Montana to the District of Columbia.

The Indictment was filed on February 10, 2021. Doc. 3.

## ARGUMENT

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act of 1984 authorizes one of those carefully limited exceptions by providing that the court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

When assessing whether pretrial detention is warranted for dangerousness, the court considers four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against

the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).  To justify detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community."  *Id.* § 3142(f).  Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he poses a concrete, prospective threat to public safety.

The statute concerning review of a Magistrate Judge's release order says nothing about the standard of the district court's review.  18 U.S.C. § 3145(a).  *Wood v. United States*, 391 F.2d 981, 984 (D.C. Cir. 1968), however, provides that "[e]valuating the competing considerations is a task for the commissioner or judge in the first instance, and then the judges of the District Court (where they have original jurisdiction over the offense) have a broad discretion to amend the conditions imposed, or to grant release outright, if they feel that the balance has been improperly struck."  When exercising that broad discretion the District Court should apply *de novo* review.  See, LCrR 59.3(b); *United States v. Chrestman*, No. 21-mj-218 (ZMF),

2021 U.S. Dist. LEXIS 36117, fn. 5 (D.D.C. Feb. 26, 2021).

Here, the Magistrate Judge concluded that the circumstances of the charges involved a riot at the Capitol in what appears to be an illegal and unlawful attempt to prevent the peaceful transition of power following an election. *Trans.*, 56:20 to 57:1. However, Josh Hughes testified only that he attended the rally, together with tens of thousand of other people, in support of the President.

The Magistrate Judge further concluded that the defendants were displeased with the results with the recent presidential election and took a deliberate course of conduct meant to disrupt the peaceful transition of power and intimidate our representatives and those charged with protecting them in an attempt to defeat the word of the people as reflected by the results of the election. The Magistrate Judge concluded that the defendants have little or no regard for the rule of law and are willing to undertake extreme and illegal manners and methods in an attempt to undermined the foundations of our democracy. The course of conduct led the Court to conclude that the defendants would show little or no regard to any condition or combinations he could impose upon them if they were released from custody pending further proceedings because they could be called to further action by someone they admire. The Magistrate Judge then concluded that defendants, based upon

13

their recent course of conduct, were a serious danger to the community as
they have shown great resolve to damage and destruct our country if they
disagree with the results of an election.  *Id.*, 57:6 to 58:22.

    The Magistrate Judge's conclusions were devoid of evidence to support
them.  Beyond his simple attendance at the President's rally, there was
absolutely no evidence presented that Joshua Hughes intended to disrupt the
peaceful transition of power and intimidate the representatives.  Other than
his mere presence, there was no evidence that he intended or attempted to
prevent the peaceful transition of power following an election.  The only
evidence presented was that he entered the building to see what was
happening inside and then followed the crowd.  At worst, Josh Hughes
thought that there was going to be a peaceful sit-in protest.  There is no
evidence that Josh Hughes had engaged in any prior planning of the events of
January 6, 2021, before his arrival at the Capitol.  He did not come to
Washington, D.C. with the intention of causing mayhem and disrupting the
democratic process.  He is not a member of any group and did not assemble
with any member of a group, but instead went to a taco eatery to get some
food and use the restroom before walking to the Capitol.  He does not own a
firearm[4] and was not armed with a weapon.  The photos show that the only

---

    [4] *Trans.*, 35:19, 20.

thing in his hand was a plastic water bottle.  Doc. 1-1, pp. 7 and 8.  He was not clothed in tactical gear.  He did not have a helmet, gas mask, or attempt to obscure his identity.  He did not destroy property.  He did not threaten or intimidate anybody or engage in violence.  He did not photograph or record anything.  He further did not encourage, facilitate, or assist anybody else that was engaged in illegal conduct.  He did not act as a leader or engage in any conspiratorial conduct.  Instead, he unlawfully entered and remained in a restricted area, merely wandering about the premises, not knowing exactly where he was most of the time.  His motivation for entering the building was to avoid separation from his brother and to observe events as they transpired.  When, five days later, he discovered that he was a person of interest, he promptly went to law enforcement and voluntarily self-identified to the FBI.  He later self-surrendered to the United States Marshal's Service in Montana.  He has acknowledged that he was wrong for being there and exhibited extreme remorse and regret for his actions at the Capitol.  The factors of 18 U.S.C. § 3142(g)(1)-(4) simply do not justify detention on the basis of dangerousness, and there are conditions or a combination of conditions will reasonably assure the safety of other persons and the community.  *Id.*, § 3142(f).

/ /

## CHARACTER LETTERS

Attached hereto are character letters from friends of Joshua Hughes, attesting to his good character.  See, Attachment B.

## CONCLUSION

The Government will no doubt argue that Joshua Hughes placed himself at the "tip of the spear" as rioters breached the Capitol on January 6, 2021, and actively destroyed government property, harassed and interfered with Capitol Police officers, and obstructed Congress's certification of the Electoral College results.  The fact of the matter is, however, that Joshua Hughes actually engaged in none of that behavior.  While he was admittedly among the first to enter the Capitol building, he destroyed no property, assaulted nobody, and encouraged or facilitated nobody.  He was at the wrong place at the wrong time, merely present, watching others engaged in the conduct complained-of.  When he realized the gravity of what was happening, he found an exit and promptly left the premises in a dream-like state of shock at the horrible nightmare he had just witnessed.

Joshua Hughes therefore requests the Court to amend his order of detention and to release him from custody, on conditions, pending trial.

/ /

/ /

DATED this 31st day of March, 2021.

By: s/ Palmer Hoovestal
      Palmer A. Hoovestal, Esq.
      D.C. Bar No. (Pending)
      Hoovestal Law Firm, PLLC
      608 Lincoln Rd. West
      Helena, MT 59602
      P.O. Box 747
      Helena, MT 59624-0747
      Tel. (406) 457-0970
      Fax (406) 457-0475
      Email: palmer@hoovestal-law.com
      Attorney for Defendant
      JOSHUA CALVIN HUGHES

## CERTIFICATE OF SERVICE
### LCr 49.2

I hereby certify that on March 31, 2021, a copy of the foregoing document was served on the following persons by the following means:

1, 2, 3  CM-ECF

\_\_\_\_  Hand Delivery

\_\_\_\_  Mail

\_\_\_\_  Overnight Delivery Service

\_\_\_\_  Fax

2, 3  E-Mail

1.    CLERK, UNITED STATES DISTRICT COURT

2.    JAMES NELSON

Assistant United States Attorney
Counsel for the United States of America
james.nelson@usdoj.gov

3.      Jonathan Zucker
        Counsel for Jerod Hughes
        jonathanzuckerlaw@gmail.com