**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-106-TJK** |
| **JOSHUA CALVIN HUGHES,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joshua Calvin Hughes to 46 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.    INTRODUCTION

The defendant, Joshua Hughes, along with his brother and co-defendant Jerod Hughes, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars in losses.[1]

Joshua Hughes advanced on the Capitol through a violent crowd on the West front, and climbed the scaffolding on the Northwest steps to pass the crowd and advance even further. He

---

[1] Although the Statement of Offense in this matter, filed on August 25, 2022, reflects a sum of approximately $1.4 million for repairs (ECF 75 at ¶ 6), as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

pressed up the stairs to the very front of the line of rioters working to break the very last police line keeping rioters away from the Capitol. As he arrived at the Senate Wing Door, he watched rioters break the windows to make the first access to the building. He eagerly jumped through the broken window to be the ninth rioter to occupy the U.S. Capitol that day. Once inside, he moved toward his brother as Jerod Hughes kicked open the Senate Wing Door to allow hundreds of rioters to stream inside. Then Joshua Hughes roamed the halls and menaced the overpowered police, chasing a lone Capitol Police officer as the crowd around him, including his brother, yelled violent and angry threats. He pressed even further, occupying the Senate chamber itself. In the days that followed, after Joshua Hughes found out he was wanted by the FBI, he threw his cell phone in the garbage.

The government recommends that the Court sentence Joshua Hughes to 46 months' incarceration, which is the muiddle of the advisory Guidelines' range of 41-51 months, as calculated by the U.S. Probation Office and agreed to by the parties. A 46-month sentence reflects the gravity of Joshua Hughes's conduct, but also acknowledges his early admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, the Hughes brothers among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building— vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds

differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into the plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, starting at approximately 2:13 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate,

including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 18-24.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and

Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

*Hughes Brothers' Travel to the Capitol*

The Hughes brothers traveled together from Helena, Montana, to Washington, D.C. According to testimony Joshua Hughes gave during his February 1, 2021, detention hearing in the District of Montana, *see* Joshua Hughes' Motion to Amend Order of Detention and for Pretrial Release, Attachment A, Dkt. No. 31-1 (hereinafter, "Joshua Hughes Transcript"), they drove through the night on January 3, all day on January 4, and spent the night in Wisconsin. *Id.* at 24. On the morning of January 5, they drove all day to Gaithersburg, Maryland, where they spent a second night. *Id.* According to a screenshot later recovered from Joshua Hughes's cell phone, he received a message from his girlfriend, on January 5, 2021, warning him that the rally he was going to was "potentially extremely violent." She urged him not to participate in any violence or "rioting crowd[s]," and added, as though she had a sense for what would follow, that "I don't want a partner who would participate in violence." Joshua Hughes responded, but only to report that he had made it to Maryland, right outside of D.C. He did not engage with her concerns about his actions the next day.



The brothers arrived in Washington, D.C., on the morning of January 6, just in time to see then-President Trump speak at the Stop the Steal rally. Joshua Hughes Transcript at 24. After the rally, they had lunch, then made their way to the U.S. Capitol, where they saw "tens of thousands" of people. *Id.* at 27. Joshua Hughes acknowledged that there was "tear gas in the air and people getting OC sprayed." *Id.* He testified that he and his brother "stayed off to the side, not engaging with any officers or anybody else," *id.*, and "walked through the crowd of people, up on the steps,

and joined the front line off to the side." *Id.* at 28. In Joshua Hughes's words, "we walked up to the top of the steps area where the cops had receded away from the barricades." *Id.*

Joshua Hughes did not mention in his sworn testimony that he and his brother in fact scaled the scaffolding to charge ahead of the crowd and get closer to the embattled police line, as shown in the screenshot below. *See* Exhibit 1 ("Insurgence USA" video), at 34:24. The video evidence showing their climb had not yet been discovered by the government, so Joshua Hughes was not asked about this missing detail during cross examination. As they climbed around inside the structure, rioters—some using chemical spray—were fighting to disarm the police and break through the line. Rioters in the crowd encouraged the mob to "push" to break the police line. Eventually, they succeeded.



*Exh. 1: Joshua Hughes (in yellow circle) and Jerod Hughes (in green circle) climb over the heads of other rioters to reach the police line mid-way up the Northwest Stairs*



*Joshua Hughes (in yellow circle) seen with helmet attached to his backpack (with red arrow)*

As he climbed through the scaffolding, Joshua Hughes can be seen in video footage carrying a helmet attached to his backpack. This indicates a measure of advance planning for violence and chaos. In his February 2021 testimony, on the other hand, Joshua Hughes claimed that he and his brother came to Washington, D.C. just to support President Trump at his rally and then "to go sightseeing." *Id.* at 25.

After the mob broke through this line halfway up the Northwest steps, the crowd surged up the final flight of stairs leading to the Upper West Terrace. One last line of police blocked the rioters' access to the doors of the U.S. Capitol. Joshua Hughes surged ahead even of the rest of the crowd, finding himself at the front of the mob facing off against these officers. *See* Exh. 1 at 39:45 (excerpted below).



Joshua Hughes was at the very front of the mob that forced the bike rack barriers down and breached the police line. He was among the very first rioters to reach the Upper West Terrace. *See id* (excerpted below); *see also* Exhibit 2 ("RMG News" video), at 49:15 (excerpted below).





Once Joshua Hughes made it across the police line and had secured his place on the Upper West Terrace, video footage appears to show him pause and wait for his brother Jerod Hughes. *See* Exhibit 3 ("BGOnTheScene" video) at 10:54 (excerpted below); *see also* Exh. 2, at 50:01 (excerpted below). They met up again just a moment or two later. Joshua Hughes's helmet can again be clearly seen in the video footage. *See* Exh. 3, at 10:54.







Joshua Hughes and Jerod Hughes headed straight for the Senate Wing Door, where they watched rioters smash the windows with their fists and with tools including a stolen police shield and an appropriated two-by-four. Joshua Hughes testified that seeing others climbing through the window, and doing so himself, sent him signals "that maybe this is a place that I shouldn't be in[.]" *Id.* at 40-41. He decided to go inside anyway. *Id.* at 41. As the screenshot below illustrates, he and his brother reached for the window panes simultaneously, and began hoisting themselves in. Jerod Hughes entered first, but Joshua Hughes appears equally eager to get inside the building for his own sake, not simply to follow or watch over his little brother. *See* Exh. 3, at 12:25. Jerod Hughes was the eighth rioter to enter the building, and Joshua Hughes was right on his heels as the ninth. *Id.* USCP surveillance footage, excerpted below, shows the brothers in the group of the first ten rioters to storm the building. *See* Exhibit 4 (USCP CCTV at Senate Wing Door interior), at 03:18.





Once inside the Capitol, Jerod Hughes, both on his own and with another rioter, kicked the

Senate Wing Door from the inside, and kicked it hard. *See* Exh. 4, at 03:23 (excerpted below).

They used enough force to bend the door, and eventually it opened. As soon as the door was

opened, rioters began streaming in. *Id.* Joshua Hughes saw Jerod Hughes kick the door, and he

walked over toward his brother. The door opened before Joshua Hughes reached it. *Id.* at 03:30

(excerpted below).





Once inside the Capitol, Joshua and Jerod Hughes headed north toward the Senate. They

marched through the halls and found a staircase that led directly to the Senate chamber, one story

up. One lone U.S. Capitol Police officer had responded to that area, and the brothers came face-to-face with Officer Eugene Goodman. *See* Exhibit 5 ("ProPublica" video), at 0:51 (excerpted below). They looked back, apparently to ensure they had the mob behind them, before engaging with Officer Goodman further. *Id.*



*Exh. 5: Joshua Hughes (in yellow circle) and Jerod Hughes (in green circle) encounter Officer Goodman (with red arrow) at the foot of the East Grand Staircase leading to the Senate*

Officer Goodman, alone and woefully outnumbered by this mob that included Joshua and Jerod Hughes, ordered the crowd to back up. No one retreated. Instead, the mob—including Joshua and Jerod Hughes—advanced. Jerod was out front, aggressively pointing at Officer Goodman and shouting, "they can't stop us!" *See* Exh. 5, at 1:05 (excerpted below). The rioters surrounding them were aggressive, and some were armed. One of the most visible rioters carried a Confederate flag, which he used to jab at Officer Goodman. As rioters filled in behind that man, they all ignored Officer Goodman's order to leave and back up. They reminded him just how alone he was there, saying, "what are you going to do, you're by yourself." *United States v. Jensen*, 21-cr-6-TJK, Transcript of Trial, Sept. 21, 2022 (testimony of Officer Goodman), attached as Exhibit A, at 204 (hereinafter, "Goodman Transcript") (page numbers refer to transcript pages). He placed his hand

on his weapon, a significant gesture that was meant to indicate to the crowd that they needed to heed his warnings. *Id*. at 208. Even this did not stop the crowd from advancing. *Id*.



Officer Goodman repeatedly ordered the rioters to back up and leave the Capitol building. The Hughes brothers and the other rioters refused those commands. Rather, the rioters kept advancing toward Officer Goodman in a menacing manner – even as Officer Goodman had his hand on his service weapon, and even after he retreated to recover a baton that had been dropped onto the floor. *Id.* at 211-212. Officer Goodman "felt like they were going to rush at any time." He was forced to retreat, because, as Officer Goodman recalled, if he had not backed up the stairs at that time, the mob "would have just engulfed me and did whatever they chose. They would have just had their way." *Id.* Video taken by a reporter in the hallway behind Officer Goodman shows Joshua Hughes and Jerod Hughes following close behind the first rioter, Douglas Jensen, pursuing Officer Goodman up the stairs. *See* Exhibit 6 ("Bobric" video) (excerpted below).





As Officer Goodman, who was facing the rioters on his own, retreated up the stairs, he radioed for backup to direct other officers to the mob's location. Jensen, followed by Joshua and Jerod Hughes and a mob of angry men, chased Officer Goodman up the stairs. When Officer Goodman reached the second floor, he positioned himself so that he was between the rioters and the Senate floor – which had not yet been evacuated.

Officer Goodman's pursuers found themselves in the Ohio Clock Corridor, just on the other

side of the wall, and one door away from the floor of the U.S. Senate, where the Vice President had been presiding just moments before. Vice President Pence was only evacuated from the area at 2:16 p.m. Senators remained on the floor waiting for a safe time to evacuate, perilously close to the angry mob that included Joshua and Jerod Hughes. And the Hughes brothers made it known that they were angry. When they faced Officer Goodman's reinforcements, they appeared unphased by the growing number of police officers.

Joshua and Jerod Hughes were at the front of the group advancing on the police line. They linked arms as they advanced. Jerod Hughes was exceptionally angry, screaming, "we are fucking mad!" and stomping his foot. Still linking their arms together, they moved forward. Joshua Hughes stood beside his brother and advanced with him. *See* Exhibit 7 ("New York Times" video) (excerpted below).



As they advanced, Jerod Hughes can be heard screaming, "There's a fucking army behind us! You guys don't want this! You don't fucking want this! And we are fucking mad! We are mad! This is my fucking house! This is my country!" Joshua Hughes was, still, right next to his brother,

advancing alongside him. *See* Exh. 2, at 53:30 (excerpted below).



Several additional U.S. Capitol Police officers joined Officer Goodman in that hallway and attempted to quell the mob. Officers reported that they were too far outnumbered to attempt to arrest the rioters, so instead they used their training to try to de-escalate the situation by talking with individuals in an attempt to calm them down. These efforts were met with shouting and aggression. As tensions remained high, rioters can be heard shouting "this is our house," "this is our America," and "we're here for the corrupt government."

The Hughes brothers left the Ohio Clock Corridor at around 2:17 p.m. (shown below).



Joshua Hughes's and Jerod Hughes's location inside the Capitol after 2:17 p.m. is unknown until approximately 2:44 p.m. It is clear, however, that they remained in the building for some time. According to Jerod Hughes's text records obtained from his cell phone, he stopped to text one of his friends, at 2:25 p.m., "We broke into the capital." By 2:44 p.m., they can be seen entering the Senate gallery, on the third floor. Video footage shows that they stayed in the Senate gallery for approximately one minute.

Minutes later, at approximately 2:48 p.m., Joshua and Jerod Hughes found their way onto the Senate floor on the second floor of the building. By that time, the Senators had been evacuated and the chamber had been breached by rioters. They entered the Senate chamber through the east doors, which had been opened from the inside by another rioter. Just as they were at the front of the crowd when the building was first breached half an hour earlier, Joshua and Jerod Hughes were once again among the first ten rioters to enter the Senate chamber.

While on the Senate floor, Joshua Hughes (circled in yellow in the images below) and Jerod Hughes (circled in green in the images below) watched along as other rioters reviewed sensitive

material stored on Senators' desks. Jerod Hughes reviewed some of these materials himself.







They walked among the Senators' desks for approximately two minutes, and exited the Senate chamber at approximately 2:51 p.m. They then exited the U.S. Capitol building through the Senate Carriage Door on the east side of the U.S. Capitol building at approximately 2:51 p.m.

According to Joshua Hughes's testimony, after they left, the brothers heard the police announcing a 6:00 p.m. curfew. Joshua Hughes Transcript, at 51. They made their way across town to their car soon afterwards, and began the drive back to Montana. *Id.*

### Joshua and Jerod Hughes's Self-Report to Helena Police Department

By January 11, 2021, Joshua and Jerod Hughes understood that they were facing possible criminal charges, and they knew from news reports that the FBI was trying to identify them. That day, they went to the Helena Police Department ("PD") to turn themselves in. They declined to speak to the FBI about the events of January 6, 2021, but they did identify themselves in photos from the U.S. Capitol. Since there was no arrest warrant for them, they left the police station that morning.

### Joshua and Jerod Hughes's Cell Phones

About a week after he reported to the Helena PD on January 11, 2021, Joshua Hughes destroyed the cell phone he had taken with him to the U.S. Capitol by throwing it in the garbage. Joshua Hughes Transcript, at 43-44.

On January 29, 2021, Joshua Hughes and Jerod Hughes reported to the Helena PD and voluntarily provided their cell phones to the FBI, with consent to search the phones. The phone Joshua Hughes provided was a Cricket phone running Android Version 10. He told the FBI that it was not the phone he had taken to the U.S. Capitol on January 6, claiming that phone had gone bad and that he threw it away. Investigators recovered a few text messages, all dated on or after January 16, 2021, in which Joshua Hughes discussed the aftermath of this investigation with his

girlfriend. She indicated she was unhappy with his actions on that day. On January 29, 2021, she suggested she should do an interview and "[t]ell them how I tried to stop you and warn you for weeks up until the insurrection." Investigators also recovered the chat pictured above, in which his girlfriend warned Joshua Hughes that the rally he was about to attend was anticipated "to be potentially extremely violent."

Testimony at Joshua Hughes' Detention Hearing[2]

An arrest warrant was issued for Joshua and Jerod Hughes on January 29, 2021. The FBI contacted both brothers to make arrangements for them to self-report to federal custody in the District of Montana on February 1, 2021. They were arraigned that day and held pending transfer to the District of Columbia.

Joshua Hughes testified in support of his request for pretrial release at the February 1, 2021, hearing. Joshua Hughes Transcript at 1. In his testimony, Joshua Hughes made a number of implausible claims about his participation in the event, many of which are contradicted by the video evidence. He testified that he did not engage in any advance planning for the events, *id.* at 49—a claim inconsistent with his decision to bring a helmet with him to the riot. He claimed that he was "very surprised" to see people smashing the windows to the Capitol building when he arrived at the Senate Wing Door, *id.* at 28—an implausible claim in light of the combat and violence he had witnessed as he crossed a battleground to get there. He claimed that he was following his brother when he went inside through the recently-broken window, *id* at 41—a claim belied by the video evidence that shows the two brothers reaching simultaneously for the window frame to hoist themselves inside. He claimed that no officers told him to leave once he had entered

---

[2] Joshua Hughes was interviewed by the FBI on April 5, 2021. As part of that proffer interview, the government agreed not to make direct use of those statements in any criminal proceeding against Joshua Hughes.

the U.S. Capitol, *id.* at 41—a claim inconsistent with the video evidence showing Officer Goodman commanding the crowd to back up and showing Inspector Thomas Loyd immediately order the crowd that had entered the Ohio Clock Corridor to "leave now." *See* Exh. 6, at 01:10.

Joshua Hughes testified that he only wound up on the Senate floor by mistake. As he put it, "We were just looking for an exit, and we went through that door and realized we were in the Senate floor." *Id.* at 42. This is inconsistent with the fact that the brothers first entered the third-floor Gallery, then entered the floor of the Senate. And it is difficult to square with the video taken inside the Capitol, which make it clear that the entry-door to the Senate floor does not resemble an exterior door.

## III.    THE CHARGES AND PLEA AGREEMENT

The Hughes brothers were charged together in a single complaint on January 28, 2021. On February 10, 2021, a federal grand jury returned an indictment charging both defendants with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Destruction of Government Property in violation of 18 U.S.C. § 1361, Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Entering and Remaining on the Floor of a House of Congress in violation of 40 U.S.C. § 5104(e)(2)(A), Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). The indictment was superseded on November 10, 2021, and again on December 1, 2021, but the charges remain the same.

On August 25, 2021, Joshua Hughes pled guilty to Count Two of the Second Superseding

Indictment, charging Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), in a combined hearing at which his brother Jerod Hughes also pled guilty to the same charge.

## IV.     STATUTORY PENALTIES

The defendant now faces sentencing on Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Obstruction of an Official Proceeding.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Guidelines calculation set forth in the PSR, which is consistent with the agreed-upon Guidelines range set forth in the plea agreement. *See* PSR ¶¶ 40-51; Plea Agreement p.3, ¶ 5(A). The Guidelines are calculated as follows:

<u>Count Two: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. §2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. §2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. §2J1.2(b)(2) | Resulted in Substantial Interference[3] | +3 |
| | **Total** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **22**[4] |

*See* Plea Agreement at ¶ 5(A), (B).

The U.S. Probation Office determined, as have the parties, that the 8-level adjustment under U.S.S.G. §2J1.2(b)(1)(B) for causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, should apply. In particular, the Probation Office determined that this adjustment is supported by the fact that Joshua Hughes encountered U.S. Capitol Police Officer Eugene Goodman at the staircase leading up to the Senate Chamber, and followed close behind other rioters who chased Officer Goodman up the staircase, despite the officer's repeated pleas to stop and back up. *See* PSR ¶ 42. The government agrees that this conduct supports the 8-level increase. Jerod and Joshua Hughes were right on the heels of

---

[3] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Joshua Hughes admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.7 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[4] As the parties and the Probation Officer all agree, the victim enhancement in U.S.S.G. § 3A1.2(a) does not apply here. Obstruction of Congress has no individual victim; the victim of obstruction in Count Two is Congress, i.e., the government. The government does not qualify as a victim for purposes of the victim enhancement in U.S.S.G. § 3A1.2(a). *See* U.S.S.G. § 3A1.2 cmt. n. 1 (victim enhancement applies "when specified individuals" are victims, but "does not apply when the only victim is an organization, agency, or the government").

Douglas Jensen, the rioter who led the chase of Officer Goodman. As they pursued him up the stairs, the mob shouted angry, hateful, and intimidating threats, including: "Keep running, motherfucker!"; "He's one person, we're thousands!"; and "what are you gonna do, beat us all?" See Exh. 5 (ProPublica video). In context, Jerod and Joshua Hughes' participation in this assault on Officer Goodman was particularly threatening.

In addition, the adjustment is warranted because of Joshua Hughes's and Jerod Hughes's efforts (which were ultimately successful) to break open the Senate Wing Door. This act made it possible for hundreds of rioters to stream into the building, contributing to the success of the rioters' mission to obstruct the Congressional proceedings and stop the certification of the electoral college votes. As Jerod Hughes kicked the door to force it open, Joshua Hughes approached the door. Joshua Hughes did not make contact with it before Jerod Hughes and another rioter had successfully breached the entryway. The enhancement applies to Joshua Hughes as well as Jerod Hughes under §1B1.3(a)(1)(B), because Joshua Hughes participated in jointly undertaken criminal activity with Jerod Hughes, where Jerod Hughes's property damage was reasonably foreseeable. According to the Architect of the Capitol, the door was in fact damaged as a result of the forced opening, and the glass and hardware needed to be replaced. The Architect of the Capitol estimated that the repair cost was approximately $7,260. As noted above, the parties are in agreement that this enhancement applies to the defendant's conduct in this case.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 54. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 22, Joshua Hughes's Guidelines imprisonment range is 41 to 51 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a significant term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a

number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh in favor of a significant term of incarceration. Joshua Hughes's actions on and leading up to January 6 show that he was prepared for the possibility of violence. He and his brother drove for several days to reach the rally where they planned to hear then-President Trump speak. His girlfriend warned him, even a day ahead of time, that significant violence was predicted for the event. While not much is known about the brothers' preparation for the trip or for the rally, video evidence shows that Joshua Hughes brought a helmet with him. A helmet is not necessary for a sightseeing trip, as Joshua Hughes later tried to characterize his visit to Washington. A helmet is necessary when a person thinks their head might be hit.

Joshua Hughes climbed the scaffolding to soar past the crowd on the Northwest steps and make his way quickly to the very front of the rioting mob. He was the ninth rioter to enter the U.S. Capitol building that day, after watching others bash windows with stolen police equipment, weapons, stray objects, and even their fists. He walked over toward his brother as Jerod Hughes was actively working to break down the door and let hundreds more violent and angry rioters

inside. Once inside, he joined a mob to chase a lone Capitol Police officer up a staircase that led directly to the floor of the United States Senate, where Senators were sheltering in place. He stood outside the Senate chamber, in the midst of an angry and vicious mob that refused to relinquish the building, as the U.S. Secret Service desperately worked to evacuate Vice President Mike Pence. He linked arms with his brother and advanced on the police line in the Ohio Clock Corridor, as the number of rioters swelled and the mob threatened to once again overrun the U.S. Capitol Police. As Joshua Hughes and Jerod Hughes stood arm-in-arm, Jerod Hughes spewed anger at the police, shouting, "We are fucking mad!" The tone was particularly menacing because the crowd had forced through countless lines of USCP officers before this one, each time successfully.

After all this, Joshua Hughes and Jerod Hughes found their way into the Senate Chamber itself. They looked around as other rioters climbed onto furniture and rifled through paperwork. Joshua Hughes watched his brother examine the confidential paperwork that had been left out in the chamber when the Senators were forced to flee. They occupied, by force, the heart of American democracy. Joshua Hughes intended to obstruct the proceedings that day. The defendant's actions on January 6 show an absolute disregard for the rule of law.

Moreover, in the aftermath of January 6, Joshua Hughes took steps to erase or minimize his involvement in the crime. Within days, he threw his cell phone away. He attempted to minimize his own motives, testifying at his detention hearing that he intended to hear the President speak and then go sightseeing—omitting to admit that he had been warned about violence or that he brought protective gear. He claimed, falsely, that he and his brother "stayed off to the side, not engaging with any officers or anybody else" as they worked their way up the stairs toward the Capitol, Joshua Hughes Transcript at 46, omitting the detail that they climbed the scaffolding in the heart of the battle for the Northwest stairs and the Upper West Terrace. He attempted to blame

his brother for his actions, asserting that he saw his brother enter the building so he "followed him, not wanting to be separated." *Id.* at 48. This narrative simply does not account for Joshua Hughes's own decisions and agency in the events that he took part in on January 6. The defendant did not wind up the ninth person to jump through a broken window and seize control of the U.S. Capitol, then the Senate chamber, by accident or sheer dumb luck. He was at the tip of the spear each time.

**B.  The History and Characteristics of the Defendant**

Joshua Hughes, age 39, is a self-employed house and commercial cleaner who works for himself. PSR ¶ 80. He has a close family and lives with his parents. PSR ¶ 61, 69. He has no criminal convictions, and two deferred prosecutions from drug possession and criminal trespass conduct that occurred many years ago. PSR ¶ 56-57. But this background of support and stability makes the defendant's conduct on January 6, and his failure to recognize the dangers of his behavior, all the more troubling.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Joshua Hughes's criminal conduct, corruptly obstructing of the proceedings in Congress from the floor of the Senate itself after breaching a number of police lines, is the epitome of disrespect for the law. When the defendant entered the

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

Capitol grounds, and the Capitol itself, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. The police were overwhelmed, outnumbered, and in some cases, in serious danger. The crowd chasing Officer Goodman through the halls and up the stairs—where Joshua Hughes was near front and center—reminded the officer just how outnumbered he was. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and future rioters, specifically, that attempts to obstruct official proceedings are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the

---

[6] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*,

21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I

don't think that any plausible argument can be made defending what happened in the Capitol on

January 6th as the exercise of First Amendment rights."). And it is important to convey to future

rioters and would-be mob participants—especially those who intend to improperly influence the

democratic process—that their actions will have consequences. There is possibly no greater factor

that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

weighs in favor of a significant term of incarceration. Joshua Hughes has never taken responsibility

for the full weight and impact of his actions, or of his own role in turning the riot into an all-out

assault on American democracy. Public images of Joshua Hughes, in a group of other rioters

carrying protective gear or dressed for battle, on the floor of the U.S. Senate, are haunting, and

will impact the country in ways Joshua Hughes has never acknowledged. And although Joshua

Hughes turned himself in, he did so only after learning he was a wanted man. *See United States*

*v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). And his claimed effort to take responsibility was itself underwhelming—he threw his cell phone in the garbage first, and only spoke about the events when he believed it served his interest at his detention hearing. This defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of the same nature.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of

> potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. The government has charged a considerable number of defendants with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

In *United States v. Jacob Chansley*, 21-cr-003-RCL, the defendant both participated in the

chase of Officer Goodman and made his way to the Senate floor, much like Joshua and Jerod Hughes. Chanlsey, a "Qanon shaman," made himself the face of the January 6 attack. He took the same path as the Hughes brothers to reach the Capitol, and like them, entered the Upper West Terrace among first 30 rioters. Unlike the Hughes brothers, he did not climb through a broken window; instead, he entered the building by walking through the very door Jerod Hughes broke open. Like the Hughes brothers, Chansley challenged police officers who directed rioters to leave and instead followed others to chase Officer Goodman up to the Ohio Clock Corridor. Chansley used a bullhorn, said former Vice President Pence was a traitor, left note on Senate dais, and gave TV interviews. Chansley's sentencing guidelines range was 41-51 months. The government requested a sentence of 51 months' incarceration, and Judge Lamberth sentenced Chansley to 41 months' imprisonment for his violation of Section 1512(c)(2).

In *United States v. Greg Rubenacker*, 21-cr-193-BAH, like the Hughes brothers and Chansley, the defendant was also among the mob who chased Officer Goodman to the Ohio Clock Corridor. Like Chansley, he entered through the door that Jerod Hughes kicked open, not through the broken window. He then exited the building, only to breach the Capitol again at a different location. When he returned, he smoked marijuana in the Rotunda, and had to be forced out with pepper spray before he would leave; he even resisted police efforts to clear him from the Rotunda by swinging a water bottle at one officer's head and throwing liquid at other officers who were engaging with a rioter. Unlike the Hughes brothers, he did not enter the Senate gallery or the Senate floor. Like the Hughes brothers, he pled guilty to 18 U.S.C. § 1512(c)(2) and faced a Guidelines range of 41-51 months. The government requested a mid-range sentence. Chief Judge Howell sentenced Rubenacker to 41 months in custody.

In *United States v. Joshua Pruitt*, 21-cr-023 (TJK), another obstruction case where the

defendant was charged under 18 U.S.C. §§ 1512(c)(2), this Court imposed sentence following the defendant's guilty plea. Pruitt had begun his initiation into the Proud Boys several weeks prior to January 6, 2021, engaged in extensive preparations for that day, and expressed his readiness for violence, including sending pictures of himself posing with weapons with accompanying text such as "Ready for the 6th." Pruitt followed a similar path toward the Capitol as the Hughes brothers, and entered through the Senate Wing Door that Jerod Hughes had kicked open. Once inside, Pruitt traveled to various locations, threw a wooden sign and a chair, and engaged in what USCP officers in the area referred to as "pre-assault indicators"—pointing his finger at officers, taunting them, and taking a fighting stance—much like the Hughes brothers and the rest of the mob in the Ohio Clock Corridor. Pruitt did not enter the Senate chamber, but he did encounter Senator Schumer and his security detail attempting to evacuate. He sped towards them, causing the offices in the detail to rush the Senator away from Pruitt. In the days following January 6, Pruitt continued to post threatening messages on social media and gave interviews in which he denied wrongdoing. Pruitt's criminal history resulted in a Guidelines range of 51 to 63 months' imprisonment. The government recommended a sentence at the high end of that range, and this Court imposed a mid-range 55-month sentence.

In four other Capitol Siege cases in which defendants pled guilty to obstruction charges, *United States v. Duke Wilson*, 21-cr-345 (RCL), *United States v. Scott Fairlamb*, 21-cr-12 (RCL), and *United States v. Marshall Neefe and Charles Bradford Smith*, 21-cr-562 (RCL), each defendant faced advisory Guidelines ranges of 41-51 months. Judge Lamberth, who sentenced all four of these defendants in addition to Chansley, imposed incarceration sentences of 41months for all except Wilson, who received 51 months.[7]

---

[7] Wilson was present in the Lower West Terrace tunnel and used a PCV pipe to attack one of the

This Court should impose sentence of 46 months in this case. As shown by the foregoing discussion of other Section 1512(c)(2) cases, such a sentence would not create an unwarranted disparity. So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[8] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

U.S. Capitol Police officers defending the building there. *United States v. Duke Wilson*, 21-cr-345 (RCL), ECF No. 29, at 11-12.

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that the defendant must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.[9] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Joshua Hughes's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 118.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 46 months, which is in the middle of the Guidelines range as calculated by the U.S. Probation Office and as agreed upon by the parties in the plea agreement, three years of supervised release, restitution of $2,000, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ *Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
Assistant United States Attorney
601 D Street, N.W.
Washington, DC 20530
emily.allen@usdoj.gov
(907) 271-4724

---

[9] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).