**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America,<br><br>v.<br><br>Joshua Calvin Hughes,<br><br>Defendant. | Case No. 21-cr-106 (TJK) |

**Reply in Support of Motion to Reduce Sentence**

The government makes only two arguments that necessitate a reply.  First, even though it previously represented on multiple occasions that Mr. Hughes "did not commit any acts of violence," *see, e.g.*, Sent'g Hr. Tr. at 18,[1] it now claims (contradictorily) that he is ineligible for a zero-point offender adjustment under U.S.S.G. § 4C1.1 because he purportedly engaged in violence or credible threats of violence on at least three separate occasions.  Second, the government claims that "the Section 3553(a) factors counsel against granting a sentence reduction," even though the government does not dispute (i) Mr. Hughes has *perfect* post-sentence conduct, (ii) would be facing a guideline range of only 4-10 months today (unlike 41-51 months as before), and (iii) is requesting a modest sentence reduction from 38 months to 33 months.  As discussed below, none of the government's arguments have merit.

---

[1] *See also id.* at 19 ("he's not charged with any acts of violence. We're not arguing that he committed any acts of violence."); *id.* at 13 ("we're not certainly arguing that he directly committed an act of violence").

**A. Mr. Hughes is eligible for a reduction under § 4C1.1.**

The government first claims that Mr. Hughes is ineligible for a sentence reduction under U.S.S.G. § 4C1.1(3) "because he used credible threats of violence against people and property[.]" *See* Gov't Opp'n at 15. In so arguing, it identifies three specific incidents, involving (1) the bike racks; (2) the stairwell with Officer Goodman; and (3) the Ohio Clock Corridor. The fundamental problem with the government's arguments, however, is that in each of these identified incidents, *other* January 6 participants arguably engaged in violence or made threatening statements, but the government makes no credible argument that *Mr. Hughes* engaged in violence or made threatening statements, which is required to be disqualified § 4C1.1(3).

**1.** For example, the government first focuses on the "final bike rack barricade at the top of the stairs" and argues that Mr. Hughes is ineligible for a sentence reduction because he "positioned himself at the front of the mob who pushed the bike racks down and overran the final police line." Gov't Opp'n, ECF No. 105 at 17. Notably, the government does not argue that *Mr. Hughes* pushed the bike racks down—because he did not. Nor does it argue that Mr. Hughes touched, kicked, or verbally threatened officers—because he did not.

The government's sentencing exhibits 1 (at 39:37-40:25), 2 (at 49:24-49:47), and 3 (at 10:09-10:55) capture the relevant portion of the incident. As the government's exhibits show, when positioned near the bike racks, Mr. Hughes is mostly a passive observant of the chaos taking place around him, often with his hands raised in the air in a non-threatening gesture:

2



Gov't Ex. 1 at 39:41 (red circle added).  The video exhibits show that Mr. Hughes never pushed

the bike racks down, but rather *other* individuals did so while Mr. Hughes stood passively on the

side:







Ex. 1. at 40:09-40:10 (red circles added).

After *others* pushed the bike racks over, Mr. Hughes walked around them:



Ex. 1 at 40:14 (red circle added).

As the relevant video exhibits demonstrate, Mr. Hughes conduct relating to this incident lacks the type of aggression that is necessary to qualify as "violent"—indeed, it lacks any aggression on his part at all.  His conduct was far more peaceful than the defendant in *Yang* who made physical contact with officers, pumped his fists in the air, grabbed an officer's baton, and rushed toward a line of officers.  *See United States v. Yang*, 23-cr-100 (JDB), 2024 WL 519962, at *5 (D.D.C. Feb. 9, 2024); *see also* Gov't Opp'n in *id*, ECF No. 34 at 2 (discussing Yang's conduct).  And it was far more peaceful than the defendant in *Doolin* who used a stolen police shield to forcibly push other January 6 participants in the "heave-ho" inside the Capitol's Tunnel to breach a police line.  *United States v. Doolin*, No. 21-cr-447 (CJN), ECF No. 313 at 2. In both *Yang* and *Doolin*, Judge Bates and Judge Nichols (respectively) found the individuals did not engage in "violence" or "credible threats of violence."  *See id.*  Given that their conduct was far more aggressive and violent than Mr. Hughes's conduct, Mr. Hughes is eligible for a sentence reduction.

**2.**  The government next focuses on the stairwell with Officer Goodman and claims that

Mr. Hughes "made himself part of the threatening mob of men who assaulted Officer Goodman

and threatened him with a spear, or other weapons, and the pole of a Confederate flag." Gov't

Opp'n at 17.[2]  Again, the government improperly focuses on *others'* conduct, rather than Mr.

Hughes's conduct.  When viewing Mr. Hughes's conduct, he did not touch or assault Officer

Goodman.  Nor did he threaten him with a spear, Confederate flagpole, or other weapon.

Rather, the video evidence shows Mr. Hughes casually walking in a non-confrontational

way, with his hands raised in the air in a peaceful manner.  *See* Def.'s Suppl. Mot., ECF No. 104

at 11-12 (showing photographs).  Unlike some others, he does not yell at Officer Goodman or

follow him up the stairs; rather, he continues walking in a different direction—away from Officer

Goodman—into a separate corridor.  *Id.*  By the time Mr. Hughes turns around and walks up the

stairs, over a dozen individuals are positioned between him and Officer Goodman.  *Id.*  And by

the time Mr. Hughes reached the top of the stairs, Officer Goodman was not even within eyesight

of Mr. Hughes, as he was already located far away in the Ohio Corridor, down the hallway and

around a corner.  *See id.*  Simply put, Mr. Hughes's silent and casual walking with his hands

raised in the air, coupled with his peering around the Capitol in an exploratory fashion away from

Officer Goodman, undercut any credible argument that he used violence against him, credibly

threatened him with violence, or had an intent to injure him.  *See United States v. Doolin*, No. 21-

cr-447 (CJN), ECF No. 313 at 2 (D.D.C. June 17, 2024) (finding defendant eligible for zero-point

offender reduction because he "did not strike officers or threaten to strike them while at the

---

[2] On Page 9, the government circles two individuals pointing at Officer Goodman, neither of
which are Mr. Hughes.

Capitol," and therefore "did not engage in violence in the ordinary meaning of that term");

*Yang*, No. 23-cr-100 (JDB), ECF No. 38 at 7 (finding Yang's contact with the officers was not

"violent," given that it was not "accompanied by 'fury, vehemence, or outrage' or the like"; nor

was his conduct "made with an intent to harm"); *United States v. Bauer*, No. 21-cr-386 ECF No.

195 at 4, 6 (D.D.C. Jan. 29, 2024) (noting "'threat' is defined as 'an expression *of an intention* to

inflict evil, injury, or damage on another'" (emphasis added)).

    **3.**  The government finally claims that "[u]pstairs in the Ohio Clock Corridor, linking

arms with his irate and frothing brother, Hughes used credible threats of violence as he ignored

Inspector Loyd's firm commands to 'leave, now,' instead marching forward, displaying his fury,

his outrage, his vehemence; showing the police officers a horrifyingly 'believable expression of an

intention to use physical force to commit harm.'"  Gov't Opp'n at 18.  Here, the government's

rhetoric exceeds reality.

    Government Exhibit 6 captures part of the incident and it shows Inspector Loyd telling

*other* individuals in the Ohio Clock Corridor to "leave now" at 1:09, but Mr. Hughes does not

even enter the Corridor until 1:19 (ten seconds later).[3]  *See* Gov't Sent'g Ex. 6.  Hence, the

government's representation that Hughes "ignored" Inspector Loyd's firm commands to "leave

now" is demonstrably false— Mr. Hughes was not present to hear Inspector Loyd's commands.

*See id.*

    Moreover, the government's argument once again improperly focuses on *others'* conduct

(*e.g.*, his brother), rather than Mr. Hughes's conduct.  Mr. Hughes's does not engage in the same

---

[3] The government's opposition similarly notes that Inspector Loyd ordered the individuals to "Leave now" at 1:10 of Exhibit 6, confirming that Mr. Hughes was not present.  *See* Gov't Opp'n at 10.

conduct as his brother.  *See* Def.'s Reply Ex. 1 at 0:46-2:16.  He is not "frothing" or "irate."  *See id.*  At no point does Mr. Hughes show a "horrifyingly" believable expression of an intention to use harm.  *See id.*  And at no point does Mr. Hughes yell at officers.  *See id.*; *see also* Gov't Sent'g Ex. 2 at 53:28-54:27.  Rather, Mr. Hughes is repeatedly depicted standing quietly and calmly with his hands raised in the air in a peaceful manner:



Def.'s Reply Ex. 1 at 0:52 (red circle added)



*Id.* at 1:08 (red circle added).



*Id.* at 1:09 (red circle added).  And when he is with his brother, he is not yelling at or credibly

threaten to injure the officers.  *See id.* at 0:46-2:16

Stripped of its over-the-top rhetoric, the government's arguments about each of the above three incidents amount to a thinly veiled attempt to repackage its "broad-guilt-by-association interpretation of § 4C1.1." *United States v. Bauer*, No. 21-cr-386 (TNM), ECF No. 195 at 9 (D.D.C. Jan. 29, 2024).  That is, even though it appears to recognize that Mr. Hughes did not strike officers or threaten to harm them while at the Capitol, he was part of a group that collectively contributed to the overall violence and intimidating environment that day.  But courts in this district to have addressed this issue, have uniformly rejected the "government's violence-by-presence theory of § 4C1.1(a)(3)." *See, e.g.*, *Yang*, No. 23-cr-100 (JDB), ECF No. 38 at 9 (rejecting government's interpretation and joining "the view of at least six other judges in this District," including Judges McFadden, Kollar-Kotelly, Friedrich, Mehta, Howell, and Boasberg).  As these courts have properly recognized, it is simply not enough that Mr. Hughes was part of a crowd where *others* engaged in violence or yelled threats at officers.  Rather, the plain text and structure of § 4C1.1 makes clear that the defendant must *personally* use violence or make credible threats of violence to be disqualified under § 4C1.1(a)(3).  *See id.*; *see also* Def.'s Suppl. Mot. at 6.

In *Doolin*, for example, Judge Nichols recently applied § 4C1.1 to a defendant used a stolen riot shield and participated in the "heave-ho" in the Tunnel to the Capitol.  *See United States v. Doolin*, No. 21-cr-447 (CJN), ECF No. 313 at 2 (D.D.C. June 17, 2024).  Judge Nichols emphasized that Mr. Doolin "did not strike officers or threaten to strike them while at the Capitol," and therefore "Doolin did not engage in violence in the ordinary meaning of that term." *Id.*

Similarly, in *Parks*, Judge Mehta applied § 4C1.1 to a defendant who government alleged

was "very close to the front engaged in th[e] crowd rush," and "aware that police were trying to prevent rioters from entering the building." *See* Sent'g Hr'g Tr. in *United States v. Parks*, No. 21-cr-411 (APM), ECF No. 125 at 38, 41 (D.D.C. Nov. 15, 2023). According to Judge Mehta, "notwithstanding what was conduct that clearly contributed to the chaos and the mayhem of the day and did so in a significant way, I just don't think any of the disqualifying factors here are applicable to his offense or to the related conduct." *Id.* at 39. He reasoned that Mr. Park "hasn't been charged or convicted for anything that involves physical harm. And to the extent that he . . . did participate in the larger crowd . . . [t]he defendant did not use violence or credible threats of violence." *Id.*

Finally, as mentioned in the opening brief, Judge Bates granted Mr. Yang a zero-point offender reduction in a written opinion, even though Yang "push[ed] back against the officers" and "remained at the front of the mob clashing with the officers." Gov't Sent'g Mem. in *Yang*, No. 23-cr-100 (JDB), ECF No. 34 at 12. The government provided no attempt to distinguish *Yang*, impliedly conceding that Mr. Yang's conduct was far more violent than Mr. Hughes.

The same reasoning and result from *Doolin*, *Parks*, and *Yang* (among others) applies here. Because Mr. Hughes did not himself engage in violence, make credible threats of violence, or have the intent to harm others, he is eligible for a sentence reduction under U.S.S.G. § 4C1.1.

### B. Reducing Mr. Hughes's sentence is consistent with the § 3553(a) sentencing factors and U.S.S.G. § 1B1.10.

The government does not deny that an identical defendant sentenced today, identical in every way to Mr. Hughes in this case, would face a guideline range of only 4-10 months (rather than 41-51 months as before), amounting to far less time than Mr. Hughes has already served. *See* ECF No. 104 at 15 (discussing guideline calculation after Amendment 821 and *United States*

*v. Brock*, 94 F.4th 39 (D.C. Cir. 2024)); *see also* ECF No. 104-1 at 9 (showing prison sentence computation).  Nor does it contest Mr. Hughes's exemplary post-conviction conduct, which involves *no* disciplinary infractions and significant programming.  *See* ECF No. 104-1.  Yet, it nonetheless claims that the § 3553(a) factors independently preclude Mr. Hughes from receiving any benefit from his retroactively reduced sentencing range.  The argument borders on the absurd.

More than anything else, the government's opposition appears to be based less on Mr. Hughes, and more on its categorical policy that *no* January 6 defendant (including Mr. Hughes) should receive the benefits of Amendment 821.[4]  Whereas before, the government claimed that no January 6 defendant was *eligible* for relief under U.S.S.G. § 4C1.1, *see, e.g.*, *Yang*, 2024 WL 519962, at *4 (rejecting the government's violence-by-presence theory of § 4C1.1(a)(3) that would presumably apply to every January 6 case), it has consistently lost that argument in this district, *see id.* at *5 (listing cases).  So now, it has pivoted and started to argue that no January 6 defendant is *deserving* of relief under 18 U.S.S.C. § 3553(a).  Indeed, the government appears to have taken the very same arguments it lost under the violence exception in U.S.S.G. § 4C1.1(a)(3) and simply repurposed them as § 3553(a) arguments.  *Compare Yang*, 2024 WL 419962, at *4 (rejecting government's argument that "§ 4C1.1 should not apply here—and

---

[4] To put the government's categorical policy in perspective, the government opposed a motion for a sentence reduction for a zero-point January 6 offender where only a ***3-day reduction*** was in dispute.  Judge Kollar-Kotelly ultimately granted the sentence reduction, demonstrating the unreasonableness of the government's position. *See United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 9 (D.D.C. Jan. 31, 2024) ("[T]he government has not proffered any convincing reason why the Court should not reduce Defendant's sentence, especially in this case when the only benefit Mr. Hernandez will receive is de minimis—a release from incarceration on February 1, 2024 as opposed to February 4, 2024").

presumably not in any January 6 case—because '[e]very rioter, whether or not they personally

engaged in violence or personally threatened violence, contributed to' the manifold harms of that

day."), *with* Gov't Opp'n at 19 (arguing that § 3553(a) factors counsel against a sentence

reduction because "[e]very rioter, whether or not they personally engaged in violence or

personally threatened violence, contributed" to the manifold harms of that day).  Hence, what

the government is really trying to do is supplant the Commission's reasoned judgment and make

Amendment 821 neither applicable nor fully retroactive to a select group of people (January 6

defendants).  But the time to make a policy argument against this retroactive amendment has

passed and Mr. Hughes plainly fits within the limited class of zero-point offenders that the

Commission determined should receive the retroactive benefit of Amendment 821.

    Aside from its generalized opposition to all January 6 offenders, the government makes

only a half-hearted attempt to oppose Mr. Hughes's individualized request for a sentence

reduction.  It offers nothing new to justify denying Mr. Hughes's modest request; rather, it

merely rehashes the facts that the Court already considered at Mr. Hughes's sentencing as if

nothing has changed from the time he was sentenced.  *See* Gov't Opp'n at 19-20.

    When focusing on the § 3553(a) factors that have changed since his original sentencing,

the government offers no persuasive reason for why Mr. Hughes should not the benefit of his

retroactively reduced guideline range.  Not once does it acknowledge the change in the

guidelines.  And not once does it dispute Mr. Hughes's perfect post-sentence conduct.  Both are

§ 3553(a) factors that the Court must consider.  *See, e.g.*, § 3553(a)(4)(A), (6); U.S.S.G. § 1B1.10

cmt. n.1(B) (iii); *Hughes v. United States*, 138 S. Ct. 1765, 1775 (2018) (the Guidelines range

"remain[s] the foundation of federal sentencing decisions"); *Pepper v. United States*, 562 U.S.

476, 491 (2011) (finding post-sentencing conduct is "highly relevant to several of the § 3553(a)

factors"). And both refute the government's conclusory assertion that they "counsel against"

Mr. Hughes receiving a sentence reduction—which likely explains why the government has

elected not to substantively address them.

Indeed, the change in Mr. Hughes's guideline range from 41-51 months to 4-10 months

is a material change to the § 3553(a) factors that *alone* warrants the modest sentence reduction

Mr. Hughes seeks (from 38 months to 33 months). As the D.C. Circuit recognized,

"[p]ractically speaking, applicable Sentencing Guidelines provide a starting point or 'anchor' for

judges and are likely to influence the sentences judges impose." *See United States v. Turner*, 548

F.3d 1094, 1099 (D.C. Cir. 2008). And because "anchoring effects influence our judgments, we

cannot be confident that judges who begin" at a higher guidelines range "would end up reaching

the same 'appropriate' sentence they would have reached" if they started from a lower

guidelines range. *United States v. Ingram*, 721 F.3d 35, 40 (2d Cir. 2013) (Calabresi, J.,

concurring). The anchoring effect of the guidelines not only influences judges, but all people,

including prosecutors (and defense attorneys), who provide influential sentencing

recommendations to the Court. *See United States v. Navarro*, 817 F.3d 494, 500 (7th Cir. 2016)

(recognizing if the government's "initial recommendation started at a lower point," a defendant

"likely would have received a lower sentence"); *United States v. Whitney*, 673 F.3d 965, 973 (9th

Cir. 2012) (recognizing "the importance of the government's sentencing recommendation").

In this case, the guidelines undoubtedly impacted Mr. Hughes's case, from the parties'

presentation to the Court to the Court's ultimate sentence. It is no coincidence that the

government requested 46 months (slightly above the bottom of the guidelines) and the Court

imposed a sentence of 38 months (slightly below the bottom of the guidelines). *See* Sent'g Hr'g

Tr. at 65 (noting "in all of the comparable cases so far, the defendant has received a guidelines

sentence"). The numbers speak for themselves. And now, by asking that this Court maintain

Mr. Hughes's 38-month sentence, the government is effectively asking that the Court transform

his *below* guideline sentence (38 months with a range of 41-51 months) into a significantly *above*

guideline sentence (38 months with a range of 4-10 months), without any explanation or

argument on the record to justify such a significant upward variance. *See* Statement of Reasons,

ECF No. 95 (noting the sentence is "below the guideline range" and providing no reasons

justifying an upward variance). The government's failure to acknowledge the significant change

to Mr. Hughes's guidelines speaks volumes as to the credibility of its argument that the § 3553(a)

factors counsel granting a sentence reduction.

## Conclusion

For the above reasons, Mr. Hughes respectfully requests that this Court grant his motion

for a sentence reduction and reduce his term of imprisonment to 33 months.


Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
BENJAMIN FLICK
Research & Writing Attorney
Federal Public Defender's Office
625 Indiana Ave, NW, Suite 550
Washington, D.C. 20004